**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| **IN RE EXXON MOBIL CORP.** | : | |
| **SECURITIES LITIGATION** | : | Civil Action No. 04-1257 (FLW) |
| | : | |
| | : | **MEMORANDUM OPINION** |
| | : | |

Presently before the Court is a motion to dismiss the Consolidated Amended Class Action Complaint, which alleges violations of (i) Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Rule 14a-9(a) promulgated thereunder, 17 C.F.R. § 240.14a-9(a); (ii) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (iii) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The motion to dismiss was filed by Exxon Mobil Corporation ("Exxon Mobil") and Lee R. Raymond [1] ("Raymond," together with Exxon Mobil, "Defendants"). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337. For the reasons set forth below, Defendants' motion to dismiss is granted.

---

[1] Raymond is the current Chairman of the Board and Chief Executive Officer of Exxon Mobil and, prior to 2004, was also the President of Exxon Mobil. Raymond has recently announced that he will retire from his positions at Exxon Mobil at the end of the year. See Jad Mouawad, *Lee Raymond, Exxon Mobil's Chief Since 1999 Merger, to Step Down at Year's End*, N.Y. Times, August 5, 2005, at C1.

## I.      BACKGROUND

### A.      Procedural history

The initial complaint in this action was filed in this Court on February 17, 2004, under the caption Binz v. Exxon-Mobil Corp. and Lee R. Raymond, Civil Action No. 04-1257 (FLW).  By Order of this Court on June 18, 2004, this case was consolidated with Estate of Hyman J. Rock v. Exxon-Mobil Corp. and Lee Raymond, Civil Action No. 04-1921 (FLW) under the caption In re Exxon Mobil Corp. Securities Litigation, Civil Action No. 04-1257 (FLW).  Subsequently, an Order dated October 26, 2004 consolidated The Ohio Public Employees Retirement System, et al. v. Exxon-Mobil Corp. et al, Civil Action No. 04-2484 (FLW) and Ticktin v. Exxon-Mobil Corp. et al, Civil Action No. 04-3629 (FLW) with Exxon Mobil Corp. Sec. Litig., Civil Action No. 04-1257 (FLW).  Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio were appointed Lead Plaintiffs, by an Order dated July 20, 2004.  Plaintiffs' Consolidated Amended Class Action Complaint (the "Complaint") was filed on October 4, 2004.  Presently before the Court is Defendants' motion to dismiss the Complaint, pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b).  For the reasons stated below, the Court grants Defendants' motion to dismiss Plaintiffs' securities fraud claims for being untimely, and while not necessary based upon the Court's ruling that the claims are time-barred, the Court also grants Defendants' motion to dismiss the Plaintiffs' claims for failure to plead with particularity as required by Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act (the "PSLRA").

### B.      The Exxon-Mobil merger

This is a class action brought under the federal securities laws on behalf of all persons and entities who were either holders of Mobil Corp. ("Mobil") common stock on May 27, 1999, when

Exxon and Mobil shareholders voted to approve a proposed merger between the two companies, or who acquired Exxon stock on or about November 30, 1999, through a stock-for-stock exchange in connection with the merger.

Exxon Mobil is an integrated oil and gas company that engages in the exploration for, and production of, crude oil and gas, the manufacture of petroleum products, and the transportation and sale of crude oil, natural gas and petroleum products.  Compl. ¶ 24.  On December 1, 1998, Exxon and Mobil publicly announced a planned merger, subject to shareholder approval.  Id. ¶ 91.  Pursuant to the merger, each share of Mobil stock would be exchanged for 1.32015 shares of Exxon stock (the "Exchange Ratio").  Id. ¶ 2.  On April 5, 1999, the two companies issued a joint proxy statement  (the "Proxy Statement") seeking shareholder approval of the proposed merger at Exxon's and Mobil's respective shareholder meetings to be held on May 27, 1999.  See Paul F. Carvelli, Esq. ("Carvelli") Decl. Ex. D.  This Proxy Statement incorporated by reference Exxon's Annual Report on Form 10-K ("10-K"), filed on March 26, 1999 with the Securities and Exchange Commission (the "SEC"), which contained Exxon's 1998 year-end financial statements.  Compl. ¶ 92.  Exxon also filed three quarterly reports on Form 10-Q ("10-Q") with the SEC, on May 15, 1999, August 13, 1999, and November 12, 1999, respectively, that incorporated statements regarding the proposed merger that were made in the Proxy Statement.[2]  Id. ¶¶ 185, 187, 189; Pls. Opp. at 4.

To be entitled to vote on the proposed merger, a Mobil shareholder had to own Mobil stock at the close of business on March 29, 1999.  See Carvelli Decl. Ex. D. at II-2.  On May 27, 1999, Mobil and Exxon shareholders approved the merger, and, after receiving regulatory approvals, the

_____

[2] In the Complaint, Plaintiffs mistakenly refer to the filing date of Exxon's Third Quarterly Report as September 30, 1999, instead of November 12, 1999.  See Compl. ¶ 189.

3

merger closed on November 30, 1999.[3]  Compl. ¶¶ 3-4.  Pursuant to the merger and Exchange Ratio, all Mobil shares were exchanged for Exxon shares in accordance with the Exchange Ratio, and Exxon subsequently changed its corporate name to Exxon Mobil Corp.  Id. ¶ 4.

## 1.   Impairment of Exxon's oil and gas assets

The gravamen of Plaintiffs' action alleges that Defendants, by failing to recognize in Exxon's 1998 year-end financial statements certain impairments to the long-term carrying value of Exxon's oil and gas assets, inflated Exxon's assets and earnings and thereby artificially inflated the value of Exxon stock to Mobil shareholders before the merger.  Compl. ¶ 96.  According to Plaintiffs, the steep drop in oil prices in 1998, see id. ¶¶ 88-89, required Exxon to report the impairment of its oil and gas fields pursuant to the Statement of Financial Accounting Standards No. 121 ("SFAS 121")[4] under the Generally Accepted Accounting Principles ("GAAP").  Id. ¶¶ 97-99.  According to the Complaint, a confidential witness, identified in the Complaint as an individual who held various financial analysis positions within Exxon USA from 1995 to 1998, and an oil and gas accounting expert will  be able to confirm that Exxon had impaired properties in 1998.[5]  See Compl. ¶¶ 127-137, 167-175.  Plaintiffs allege that Exxon, by not reporting the SFAS 121 impairments, maintained its stock value at artificially high levels and thus avoided paying more shares of its stock to Mobil shareholders in the merger.  Id. ¶ 250(a).  According to Plaintiffs, Exxon should have recognized an

---

[3] According to Exxon's 10-Q filed with the SEC on August 13, 1999, Mobil shareholders overwhelmingly approved the Merger "with 613,913,495 votes for, 10,874,343 against, and 3,387,746 abstentions."  Carvelli Decl. Ex. E at 21.

[4] See Compl. ¶¶ 67-87 for Plaintiffs' detailed overview of SFAS 121.

[5] According to Defendants, Plaintiffs improperly used Exxon Mobil trade secrets and other confidential business information by including information supplied by the confidential witness in the Complaint.  See Defs. Reply at 11, n. 8; Ex. D-E.

impairment of approximately $3.7 billion.  Id. ¶ 250(a)(i).  Given the stock allocation to Exxon and Mobil shareholders resulting from the merger,[6] Plaintiffs allege that Exxon "shortchang[ed] Mobil shareholders" by as much as $18 billion.  Pls. Opp. at 24.  Alternatively, Plaintiffs claim that if Exxon had taken the impairments and reduced its 1995-1998 net earnings by $3.7 billion, Mobil shareholders would have received an extra 2.3% of the outstanding stock of the combined company.[7]  Compl. ¶ 250(a)(iv).

Defendants, on the other hand, assert that Exxon did not have to recognize any impairment of its oil and gas assets because its "disciplined investment and asset management program" regularly reviewed properties and also monitored underperforming assets that the company ultimately "improved to acceptable levels or divested."  Defs. Mot. Summ. J. at 10, 30.  In its 1998 Annual Report on Form 10-K, Exxon claimed that its asset management program created a "very efficient capital base," which thereby eliminated the need to impair certain of its oil and gas assets in 1998. See Pls. Opp. at 10.

**2.        Plaintiffs' securities fraud claims**

Count I of the Complaint asserts a violation of Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.  In pertinent part, Section 14(a) states that

> [i]t shall be unlawful for any person ... in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit ... any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 78l of the Act.

---

[6] The terms of the merger provided that Exxon shareholders would own approximately 70% of the combined company and former Mobil shareholders would own approximately 30 percent.  Compl. ¶ 2.

[7] According to Plaintiffs, an additional 2.3% of the outstanding stock of the combined company represents $4.6 billion in damages to Mobil shareholders.  Compl. ¶ 250(a)(iv).

15 U.S.C. § 78n(a).  Rule 14a-9 provides, in relevant part, that

> [n]o solicitation ... shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ....

17 C.F.R. § 240.14a-9(a).  Plaintiffs allege that the Proxy Statement filed in connection with the merger, which contained Exxon's 1998 year-end financial statements, was false and misleading because it "(i) failed to record any SFAS 121 impairment for oil and gas properties ... (ii) failed to disclose any internal accounting policy that could have explained its failure to report an impairment, as GAAP and SEC Regulations required; and (iii) resulted in a material overstatement of Exxon's net income."  Compl. ¶ 235.  Because of these omissions and inaccurate financial statements, Plaintiffs claim that Mobil shareholders "did not receive the consideration for their Mobil stock that [D]efendants told them they would get."  Id. ¶ 238; see also id. ¶¶ 229-240.

Count II of the Complaint alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5 renders it illegal to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).  Section 10(b) and Rule 10b-5 reach "beyond statements and omissions made in a registration statement or

prospectus in connection with an initial distribution of securities and create liability for "false or misleading statements or omissions of material fact that affect trading on the secondary market."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir.1997).  In Count II, Plaintiffs advance the same allegations asserted in their Section 14(a) claim and additionally allege that Exxon's three quarterly reports on Form 10-Q filed subsequent to the Proxy Statement and prior to the closing of the merger contained similarly false and misleading statements.  Compl. ¶¶ 16, 185-190.

Count III of the Complaint alleges a violation of Section 20(a) of the Exchange Act by Raymond, Exxon's most senior corporate officer at the time of the merger.  Section 20(a) imposes joint and several liability on any person who "controls a person liable under any provision of the [Exchange Act]."  Shapiro v. UJB Financial Corp., 964 F.2d 272, 279 (3d Cir.1992).  Under the plain language of the statute, a plaintiff must "prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act.  If no controlled person is liable, there can be no controlling person liability."  Id. (citation omitted).  Section 20(a) is a predicate offense, requiring a violation of some other section of the Exchange Act in order to be applicable.  15 U.S.C. § 78t(a).  Here, Plaintiffs allege that Raymond manipulated the value of Exxon stock "to ensure the Mobil acquisition's success."  Pls. Opp. at 29-30.  According to Plaintiffs, Raymond's "unusually large executive compensation package" is indicative of "heightened motive and opportunity" that satisfies the scienter requirement of a securities fraud claim.  Pls. Opp. at 30.

**C.    Statute of limitations**

Defendants have moved to dismiss Plaintiffs' securities fraud claims on the ground that they are barred by the statute of limitations.  Specifically, Defendants contend that the limitations period governing the Section 14(a) and Section 10(b) claims is one year after the discovery of the alleged

wrongdoing or three years from the occurrence of the alleged wrongdoing, whichever period is shorter.  See Defs. Mot. Summ. J. at 12.  Defendants further assert that Plaintiffs were on inquiry notice of the alleged misstatements when the Proxy Statement was disseminated in April 1999.  See id. at 18.  Finally, Defendants claim that Plaintiffs have failed to adequately plead scienter.  Plaintiffs respond that the appropriate limitations period for their claims is to be found in Section 804 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), and regardless, they were not on inquiry notice of their claims before March 2004.  See Pls. Opp. at 7.  Furthermore, Plaintiffs assert that their securities fraud claims actually arose on November 30, 1999, when the merger was consummated.  Plaintiffs thus contend that their claims were not time-barred prior to Sarbanes-Oxley becoming effective on July 30, 2002.

## II.      DISCUSSION

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted."  A claim should be dismissed only if  "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 215 (3d Cir.2002) (citations omitted).  The inquiry is not whether plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claims.  Id. (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  In deciding a Rule 12(b)(6) motion, courts must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  Id. (citations omitted).  Nevertheless, courts are not required to credit bald assertions or legal conclusions alleged in the complaint.  Id. at 216 (citing Burlington Coat, 114 F.3d at 1429).  Similarly, legal conclusions draped in the guise of factual allegations do not benefit from the presumption of

8

truthfulness.  Id. (citing In re Nice Sys., Ltd. Sec. Litig., 135 F.Supp.2d 551, 565 (D.N.J. 2001)).

As a general matter, courts ruling on a motion to dismiss may not consider matters extraneous to the complaint.  Burlington Coat, 114 F.3d at 1426 (citation omitted).  However, an exception to the general rule is that a "'document integral to or explicitly relied upon in the complaint'" may be considered "'without converting the motion [to dismiss] into one for summary judgment.'"  Id. (emphasis omitted) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir.1996); citing In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 368 n.9 (3d Cir.1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.")).  The rationale underlying this exception is that the primary problem raised by considering documents outside the complaint – lack of notice to the plaintiff – has dissipated where plaintiff has actual notice and has relied upon the documents in framing the complaint.  Id. (quotations and citations omitted).  For the same reason, courts may consider matters of public record that are relied upon or cited in the complaint.  In re Cybershop.com Sec. Litig., 189 F.Supp.2d 214, 223-24 (D.N.J. 2002).  Relevant to this action, the Court also may consider SEC filings, even if those filings are not relied on in the complaint.  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir.2002) ("NAHC").

## A.    Applicability of Rule 9(b)

Independent of the standard applicable to Rule 12(b)(6) motions, Fed.R.Civ.P. 9(b) ("Rule 9(b)") requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed.R.Civ.P. 9(b).  This particularity requirement has been rigorously applied in securities fraud cases.  See Burlington Coat, 114 F.3d at 1417.  As such, plaintiffs asserting securities fraud claims must specify "'the who, what, when, where, and how: the

9

first paragraph of any newspaper story.'" In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d

Cir.1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990)).  "Although Rule 9(b)

falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs

must use 'alternative means of injecting precision and some measure of substantiation into their

allegations of fraud.'"  Rockefeller, 311 F.3d at 216 (quoting Nice Sys., 135 F.Supp.2d at 577).  In

this matter, Rule 9(b) governs Plaintiffs' Exchange Act claims.

## B.    Private Securities Litigation Reform Act

In addition to Rule 9(b), plaintiffs alleging securities fraud pursuant to the Exchange Act must

also comply with the heightened pleading requirements of the PSLRA.  15 U.S.C. §§ 78u-4(b)(1),

(b)(2).  The PSLRA "imposes another layer of factual particularity to allegations of securities fraud."

Rockefeller, 311 F.3d at 217.  Under the PSLRA, any securities fraud claim brought under the

Exchange Act must "specify each statement alleged to have been misleading, the reason or reasons

why the statement is misleading, and, if an allegation regarding the statement or omission is made on

information and belief, the complaint shall state with particularity all facts on which that belief is

formed."  15 U.S.C. § 78u-4(b)(1)(B).  Furthermore, with respect to securities fraud claims in which

recovery of monetary damages is contingent on proof that the defendant acted with a particular state

of mind, the PSLRA mandates that "the complaint shall, with respect to each act or omission alleged

to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  As the Third Circuit noted in

Advanta, in Rule 10b-5 actions, this requirement supersedes the provisions of Rule 9(b) to the extent

that rule would otherwise permit a state of mind to be averred generally.  Advanta, 180 F.3d at 531

n. 5.  Similarly, a Section 14(a) claim must meet the PSLRA particularity requirements if a plaintiff

elects to ground such claim in fraud.  See NAHC, 306 F.3d at 1329 (applying PSLRA particularity

standard to Section 14(a) claims); see also California Public Employees' Retirement System v. Chubb

Corp., 394 F.3d 126, 144-45 (3d Cir.2004) ("CalPERS").  If a complaint fails to comply with the

specific pleading requirements of the PSLRA, dismissal of the complaint is statutorily mandated.  15

U.S.C. § 78u-4(b)(3)(A).  In the Third Circuit, a plaintiff may establish the requisite strong inference

of fraudulent intent in one of two ways: (1) "by alleging facts establishing a motive and an

opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of

either recklessness or conscious behavior."  Advanta, 180 F.3d at 534-35 (citations omitted).

**C.      Statute of limitations for securities fraud claims**

         Prior to the enactment of Sarbanes-Oxley, the statute of limitations for Exchange Act claims

was the earlier of one-year after discovery of the alleged wrongdoing or three years from the

occurrence of the alleged violation.  See Lampf, Pleva, Lipkin, Prupis & Petigrow v. Gilbertson, 501

U.S. 350, 364 (1991); NAHC, 306 F.3d at 1324 (addressing one year discovery period in 10(b)

claims); G.E. Stricklin v. Ferland, 1998 WL 966023, at *4 (E.D.Pa. Nov. 10, 1998) (finding that one

year/three year regime applies to Section 14(a) actions); Westinghouse Elec. Corp. v. Franklin, 993

F.2d 349, 353 (3d Cir.1993) (holding that for purposes of determining the appropriate limitations

period, Section 14(a) actions are treated identically to actions under Section 10(b)).

         On July 30, 2002, Congress enacted the Sarbanes-Oxley Act.  Section 804 of Sarbanes-Oxley

("Section 804") lengthened the statute of limitations for certain private causes of action to two years

after the discovery of the wrongdoing or five years from the alleged violation, whichever was earlier.

See 28 U.S.C. § 1658(b). Section 804, entitled "Statute of Limitations for Securities Fraud," provides

in pertinent part that:

11

a private right of action that involves a claim of fraud, deceit, manipulation or contravance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)),[8] may be brought not later than the earlier of – (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation. 28 U.S.C. § 1658.

Congress directed that the new, longer limitations period "shall apply to all proceedings addressed by this section that commenced on or after the date of enactment [July 30, 2002] of this Act." Sarbanes-Oxley Act § 804(b).  Congress further provided that "[n]othing in this section shall create a new, private right of action."  Id. § 804(c).  In addition, the Second, Seventh and Eighth Circuits, as well as several district courts within the Third Circuit, have held that Sarbanes-Oxley cannot be applied retroactively and does not revive claims that were time-barred prior to its enactment.  See In re Interpool, Inc. Sec. Litig., No. 04-321, 2005 WL 2000237, slip op. at *19, n. 11 (D.N.J. Aug. 17, 2005); In re Enterprise Mortgage Acceptance Co., Sec. Litig., 391 F.3d 401, 410 (2d Cir.2004); In re Worldcom, Inc. Sec. Litig., 2004 WL 1435356, at *7 (S.D.N.Y. Jun. 28, 2004); Lieberman v. Cambridge Partners, L.L.C., 2004 WL 1396750, at *3 (E.D.Pa. Jun. 21, 2004); L-3 Communications Corp. v. Clevenger, 2004 WL 1941248, at *5-6 (E.D.Pa. Aug. 31, 2004); Northwestern Human Services, Inc. v. Panaccio, 2004 WL 2166293, at *17 (E.D.Pa. Sept. 24, 2004); see also In re ADC Telecommunications, Inc. Sec. Litig., 409 F.3d 974, 978 (8th Cir.2005); Foss v. Bear, Stearns & Co., Inc., 394 F.3d 540, 542 (7th Cir.2005).[9]

---

[8] Section 3(a)(47) provides: "The term 'securities laws' means the Securities Act of 1933, the Securities Exchange Act of 1934, the Public Utility Holding Company Act of 1939, the Investment Company Act of 1940, the Investment Advisers Act of 1940, and the Securities Investor Protection Act of 1970."

[9] See discussion infra at 19-20.

1.      **Inquiry notice**

Courts within this Circuit have uniformly adopted the "inquiry notice" standard to determine when a plaintiff should have discovered the existence of a cause of action under the federal securities laws.  See Del Sontro v. Cendant Corp., 223 F.Supp.2d 563, 571 (D.N.J. 2002).  Therefore, the statute of limitations begins to run from the time that a plaintiff is on "inquiry notice" to investigate a potential securities claim.  NAHC, 306 F.3d at 1314, 1325.  Under this standard, the one-year period (now two-year under Sarbanes-Oxley) begins to run when the plaintiffs "discovered or in the exercise of reasonable diligence should have discovered the basis for their claim" against the defendant.  See In re Campbell Soup Co. Sec. Litig., 145 F.Supp.2d 574, 601 (D.N.J. 2001) (stating that an investor's duty to investigate is triggered "'when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded ....'") (citing Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir.2000)).  Courts in this District have previously stated that a determination of the timing of a plaintiff's knowledge of his claim is a "fact-intensive inquiry."  Nappier v. Pricewaterhouse Coopers LLP, 227 F.Supp.2d 263, 274 (D.N.J. 2002); see also Campbell Soup, 145 F.Supp.2d at 602 (stating that "it is inappropriate to dismiss claims as time-barred where ... the analysis is so fact-intensive.") (citations omitted); In re Lucent Technologies, Inc. Sec. Litig., 217 F.Supp.2d 529, 542 (D.N.J. 2002) (stating that "'[w]hether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud under ... Rule 10b-5 is a question of fact, and such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).'" (quoting Marks v. CDW Comp. Centers, Inc., 122 F.3d 363, 367 (7th Cir.1997)); Gruber v. Price Waterhouse, 697 F.Supp. 859, 861 (E.D.Pa. 1988) (finding that "[i]n the context of the statute of limitations defense, where contrary inferences may reasonably be drawn from the facts which are material to when the cause of action accrued,

defendants bear a heavy burden of showing that the claims are untimely as a matter of law.") (citations omitted); but cf. NAHC, 306 F.3d at 1326-27 (recognizing that statute of limitations questions may be resolved on a motion to dismiss).

Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had "sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." NAHC, 306 F.3d at 1325 (citation omitted). The test for "storm warnings" is an objective one, based on whether a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning. Id. Information that may be held to constitute inquiry notice includes "substantial conflicts between oral representations of the brokers and the text of the prospectus, ... the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased, or any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions have been made." Id. at 1326 n.5 (quoting Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 252 (3d Cir.2001)). The defendants bear the initial burden of showing the existence of "storm warnings." Mathews, 260 F.3d at 252. Once the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable diligence, but were unable to discover their injuries. NAHC, 306 F.3d at 1326. If the plaintiffs' duty to exercise due diligence is triggered, the plaintiffs "'are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period.'" Id. (quoting Gruber, 697 F.Supp. at 864).

Here, Defendants argue that Plaintiffs were on inquiry notice of their Exchange Act claims by April 1999, when the Proxy Statement was disseminated to Plaintiffs in connection with the

14

merger, and that these claims are thus time-barred.  On the other hand, Plaintiffs contend that they could not have known about Defendants' fraudulent statements until the initial complaint in the matter was filed in March 2004[10] because "there was no conflicting information that could have possibly put a reasonable Mobil investor on notice that (i) Exxon's statements that it had no impaired oil and gas assets to report under SFAS 121 and (ii) Exxon's explanation thereof, were false."  Pls. Opp. at 6.  The Court finds Plaintiffs' arguments without merit and finds that their Sections 14(a) and 10(b) claims are time-barred under the one year discovery statute of limitations and that the lengthened limitations period under Section 804 does not apply to Plaintiffs' case.

The Court finds unreasonable Plaintiffs' claim that they were unaware of the alleged fraud because there was "no mix of information to create storm warnings" and "the only information available to [P]laintiffs was Exxon's own false statements."  Pls. Opp. at 7.  Plaintiffs unequivocally allege in their Complaint that 1998 "experienc[ed] the sharpest annual collapse in oil prices since 1990," Compl. ¶ 89, and that it was this "steep oil price decline that triggered the obligation under SFAS 121 to ... report impairments of oil and gas fields."  Comp. ¶ 101.  Plaintiffs even point to various forecasts of the collapse in oil prices made by the U.S. Department of Energy and other prominent businessmen in the oil industry as early as 1998.  See id. ¶¶ 204-214.  Thus, the industry conditions that allegedly mandated companies like Exxon to report such impairments existed a year prior to any statements made by Defendants in the 1999 Proxy Statement.  Plaintiffs also describe in great detail how, as a result of historically low oil prices, Exxon's competitors reported SFAS 121 impairments of their oil and gas assets in 1998 - again, a year before the merger transaction occurred. See Compl. ¶¶ 104-111.  Plaintiffs do not dispute the fact that the reporting of such impairments by

---

[10] See infra at 17-18 for discussion of Plaintiffs' claim that the inquiry notice trigger date was March 2004.

these companies was public information.[11]  The actions of Exxon's competitors, combined with Defendants's explicit admission that the company did not recognize impairments of its oil and gas assets in its 1998 Annual Report, which was filed with the SEC in March 1999 and was incorporated by reference in the Proxy Statement, provided the "red flags" that should have alerted Plaintiffs to the possibility that Defendants made misleading statements or significant omissions regarding the true nature of Exxon's financial condition.  Plaintiffs nonetheless contend that they "were entitled to rely, " Pls. Opp. at 7, on Exxon's explanation of why the company did not record certain impairments. However, while investors may not be considered to have been placed on inquiry notice where "'warning signs are accompanied by reliable words of comfort from management'" such that "'an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns,'" DaimlerChrysler AG Sec. Litig., 269 F.Supp.2d 508, 515 (D.Del. 2003) (quoting LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir.2003)) (emphasis added), plaintiffs in a securities fraud action may not simply rely on reassurances by management particularly when there are direct contradictions between the defendants' representations and the other materials  available to plaintiffs regarding the possibility of fraud.  See In re Merrill Lynch Ltd. P'ships Litig., 7 F.Supp.2d 256, 275 (S.D.N.Y. 1997).

Here, the public information regarding the impairments taken by other oil and gas companies directly contradicted Exxon's actions of not reporting the SFAS 121 impairments.  Given this discrepancy and the collapse of oil prices which occurred a year before the merger, it was not reasonable, beyond when the Proxy Statement was disseminated on April 1999, for Plaintiffs to defer

---

[11] In fact, Plaintiffs refer to these companies' 1998 Annual Reports on Form 10-K, which were public documents filed with the SEC, that disclosed the reporting of impairments of certain oil and gas assets.  See Compl. ¶¶ 105-106, 110-111.

to Defendants' statements regarding Exxon's decision not to record certain impairments and its representations of Exxon's assets and earnings.  Plaintiffs did not need to "know all of the details or 'narrow aspects' of the alleged fraud to trigger the limitations period."  NAHC, 306 F.3d at 1326. Here, there was sufficient concrete information available to Plaintiffs by April 1999 to start the limitations period running.

The Court finds incongruous Plaintiffs' argument that the reporting of impairments by Exxon's competitors, at most, raised "vague suspicions" of fraud insufficient for inquiry notice, in the face of Plaintiffs' allegations that "the actions of Exxon's peers provide circumstantial evidence of [unrecognized] impairments." Compl. ¶ 100.  These allegations constitute the core of Plaintiffs' securities fraud claims against Defendants.  In addition, Defendants' unequivocal explanation of why Exxon did not recognize impairments of its oil and gas assets expressed far more than a mere inconsistency about Exxon's financial condition: it strikes at the heart of Plaintiffs' allegations that Exxon's 1998 year-end financial statements, incorporated in the Proxy Statement, were false and misleading.  Thus, assuming the allegations in the Complaint are true, Plaintiffs had more than sufficient reason to believe that Defendants' statements in the Proxy Statement contained misstatements regarding Exxon's financial status, and thus were on inquiry notice as of April 1999.

Moreover, Plaintiffs have failed to provide the date for when they had inquiry notice of the alleged fraud.  Plaintiffs' statement that the inquiry notice trigger date was March 2004 strains credulity.  Plaintiffs claim that they "did not learn of their claims until after the ... complaint [in Binz v. Exxon-Mobil Corp. and Lee R. Raymond, Civil Action No. 04-1257 (FLW)] was filed in March 2004."  Pls. Opp. at 7.  However, the Binz complaint alleges the same fraudulent conduct as the Complaint in this matter, and adds no allegations or facts other than what were already known when

the Proxy Statement was issued on April 9, 1999.  For instance, the <u>Binz</u> complaint alleges that the 1999 Proxy Statement contained financial misstatements that originally appeared in Exxon's 10-K for the year ending 1998.  <u>See Binz</u> Compl. ¶ 11.  The <u>Binz</u> plaintiff also claims that the Proxy Statement was false and misleading because Exxon did not properly record the SFAS 121 impairments for its oil and gas assets.  <u>See id.</u> ¶ 29.  Therefore, not only is it logical that the <u>Binz</u> plaintiff was aware of the information upon which to base the securities fraud allegations <u>prior</u> to March 2004, but the <u>Binz</u> complaint could not have provided Plaintiffs in this matter with any additional information that they could have used in forming their claims against Defendants.  It is irrelevant, for inquiry notice purposes, whether Plaintiffs in particular did not know about the existence of certain facts suggesting wrongdoing.  The standard for inquiry notice is whether a reasonable investor should have discovered the probability that he or she had been defrauded.  Because the <u>Binz</u> plaintiff must have known about the existence of certain facts suggesting fraudulent conduct on part of Defendants prior to the filing of the complaint in March 2004, the same information was available to Plaintiffs in this matter.  Thus, the Court finds that an investor of ordinary intelligence, in the exercise of reasonable diligence, would have discovered the basis of the claims asserted in this case prior to March 2004.

In sum, Plaintiffs' allegations regarding the SFAS 121 impairments relate to conduct that occurred prior to November 30, 1999, and specifically, were known by April 9, 1999.  Although some courts have found that it is inappropriate to dismiss a claim as time–barred because an analysis of inquiry notice is so fact-intensive,[12] in this matter, it is readily apparent from the face of the Complaint that Plaintiffs were on inquiry notice of the alleged fraud no later than April 9, 1999.  <u>See</u> <u>NAHC</u>, 306

---

[12] <u>See</u> discussion <u>supra</u> at 13-14.

F.3d at 1326-27 (finding securities fraud claim time-barred on motion to dismiss because plaintiffs had notice of defendant's overstatement of value of its business, through various SEC filings and general condition of defendant's kind of business in financial markets, approximately three months prior to date plaintiffs alleged they were placed on notice of alleged fraud); see also In re Dreyfus Aggressive Growth Mut. Fund Litig., 2000 WL 10211, at *3 (S.D.N.Y. Jan. 6, 2000) (recognizing that in certain circumstances, inquiry notice may be determined as a matter of law). Because the allegations in the Complaint, even when all reasonable inferences are drawn in favor of Plaintiffs, clearly demonstrate, based on the undisputed facts, what was known to investors on April 9, 1999, the Court finds as a matter of law that Plaintiffs were on inquiry notice in April 1999, and thus, Plaintiffs' Sections 10(b) and 14(a) claims are time-barred under the one-year discovery limitations period.

### 2.    Sarbanes-Oxley does not revive time-barred claims

Although Section 804 of Sarbanes-Oxley extended the limitations period to two years from discovery of the alleged wrongdoing, district courts within the Third Circuit as well as the Second, Seventh and Eighth Circuit courts have held that Sarbanes-Oxley cannot be applied retroactively to revive claims that were time-barred prior to the statute's enactment. See supra at 12. Sarbanes-Oxley became effective on July 30, 2002 and since Plaintiffs were on inquiry notice of Defendants' alleged fraud as of April 9, 1999, their Exchange Act claims were time-barred as of April 9, 2000 - one year after Defendants' alleged misrepresentations in the Proxy Statement and more than two years before the enactment of the statute. Thus, the extended statute of limitations under Sarbanes-Oxley does not revive Plaintiffs' time-barred claims.

In support of their retroactivity argument, Plaintiffs cite to an SEC amicus brief, filed in

connection with a non-precedential case, <u>AIG Asian Infrastructure v. Chase Manhattan</u>, 122 Fed.Appx. 541 (2d Cir.2005), which urged the Second Circuit to retroactively apply the new limitations period under Sarbanes-Oxley based on the plain meaning of Section 804(b). <u>See</u> Pls. App. G; Pls. Opp. at 15. However, not only did the <u>AIG Asian</u> court refuse to adopt the SEC's position, but the retroactivity argument was explicitly rejected by the Second Circuit in <u>Enterprise Mortgage</u>, 391 F.3d at 406 (holding that Sarbanes-Oxley is not retroactive and that "neither the statutory language nor the legislative history of Section 804 indicate that Congress clearly favored retroactive application ...."). The Seventh and Eighth Circuits have also agreed with this position. <u>See</u> <u>ADC Telecommunications</u>, 409 F.3d at 978 (citing <u>Enterprise Mortgage</u>, 391 F.3d at 407 and stating that "the Second Circuit has provided a thorough and well reasoned opinion refusing to retroactively apply ... Sarbanes-Oxley ... to revive stale claims."); <u>See also</u> <u>Foss</u>, 394 F.3d at 542 (finding persuasive the Second Circuit's reasoning in <u>Enterprise Mortgage</u> and stating that the court has "nothing to add to the [S]econd [C]ircuit's explanation."). Furthermore, no Third Circuit case has held that Section 804 revives time-barred securities fraud claims. Indeed, most recently, the court in <u>Interpool</u> noted that "it is impermissible to utilize [Sarbanes-Oxley] § 804 to revive claims that were time-barred when the [statute] took effect on July 30, 2002." <u>Interpool</u>, No. 04-321, 2005 WL 2000237, at *19, n. 11. This Court finds persuasive the reasoning in the decisions of the Second, Seventh and Eighth Circuits that there is a presumption against retroactive application and that the lack of clear Congressional intent for retroactivity lends strong support to the conclusion that Plaintiffs in this matter cannot resurrect their previously time-barred securities fraud claims.

### 3.    The three-year statute of limitations period

Even if Plaintiffs did not have inquiry notice of Defendants' alleged fraud, their Exchange Act

claims are still time-barred under the three-year limitations period which runs from the time of the wrongdoing.  In support of their argument that their securities fraud claims arose on November 30, 1999 (and thus were not time-barred when Sarbanes-Oxley became effective on July 30, 2002), Plaintiffs rely primarily on Baron v. Allied Artists Pictures Corp., 717 F.2d 105 (3d Cir.1983).  Baron held that a Section 14(a) claim does not accrue until a merger is consummated and Plaintiffs contend that this conclusion is a "matter of common sense embraced in federal law."  Pls. Opp. at 10; See Baron, 717 F.2d at 109.  However, Baron pre-dates Sarbanes-Oxley and the decisions of the courts in this Circuit which have held that actions under Sections 10(b) and 14(a) arise on the date that the allegedly false or misleading statement underlying the claims was made.  See Del Sontro, 223 F.Supp.2d at 573 (finding that Sections 10(b) and 14(a) actions "arise on the date the allegedly false or misleading statement underlying the claims was made."); NAHC, 306 F.3d at 1330 (stating that statement or omission must have been misleading at time it was made and that "liability cannot be imposed on the basis of subsequent events.") (citation omitted); Northwestern, 2004 WL 2166293, at *18 (stating that Section 10(b) violation occurs "on the date that the alleged fraudulent misrepresentation is made or, in the case of an omission, on the date a duty to disclose the withheld information arises."); In re Prudential Ins. Co. of Am. Sales Practices Litig., 975 F.Supp. 584, 605 (D.N.J. 1996) (finding that three-year limitations period for Section 10(b) claims begins on date a defendant makes an affirmative misrepresentation); In re Phar-Mor, Inc. Sec. Litig., 892 F.Supp. 676, 686 (W.D.Pa. 1995) (holding that Section 10(b) violation occurs on date of alleged misrepresentation, not the date of the sale or purchase of securities); In re Westinghouse Sec. Litig., 832 F.Supp. 989, 999 (W.D.Pa. 1993) (finding that Section 14(a) violation occurs when the false or misleading proxy statement is issued) (citations omitted).

21

Furthermore, in light of the Third Circuit's decision to apply the limitations period for actions brought under Section 10(b) (pursuant to which plaintiffs must bring securities claims actions within one year of the time they discover the alleged fraud, and no later than three years of the securities law violation itself) to actions brought under Section 14(a), see Westinghouse Elec. Corp., 993 F.2d at 353, it is clear that the three-year repose period for Section 14(a) claims begins to run at the time the misleading statement is made. Thus, in this matter, Plaintiffs' Section 14(a) claim arose on April 9, 1999, the date the allegedly misleading Proxy Statement was disseminated to Mobil shareholders, and was time-barred as of April 9, 2002. Since Plaintiffs did not file suit until 2004,[13] their claims are untimely under the three-year limitations period. Moreover, the extended five-year limitations period under Sarbanes-Oxley does not apply to Plaintiffs' Section 14(a) claim because such claim was time-barred on April 9, 2002 - prior to the July 2002 passage of the statute- and Section 804 does not revive claims that were time-barred prior to the statute's enactment. See discussion supra at 19-20.

Plaintiffs also contend that their Section 10(b) claim accrued on November 30, 1999 because that is when Plaintiffs exchanged their Mobil shares for Exxon shares in connection with the merger and hence participated in the "purchase or sale" of securities. See Pls. Opp. at 11-12. In support of this argument, Plaintiffs cite to Hill v. Equitable Trust Co., 851 F.2d 691 (3d Cir.1988), which held that the limitations period for Section 10(b) cases had "a maximum outside limit of three years from date of purchase." Hill, 851 F.2d at 698 (emphasis added) (citation omitted). However, the Court

---

[13] The parties dispute exactly when Plaintiffs first filed their Section 10(b) claim in this matter. According to Defendants, Plaintiffs first asserted their Section 10(b) claim on May 27, 2004. See Defs. Mot. Summ. J. at 16. On the contrary, Plaintiffs contend that their initial complaint was filed on March 17, 2004 because their Section 10(b) claim "relates-back" to the claims asserted in that complaint, which alleged "a nearly identical claim for violation of § 14(e) ...." Pls. Opp. at 19. Regardless of whether Plaintiffs' Exchange Act claims were filed in March or May of 2004, the Court finds that Plaintiffs do not have a viable cause of action because their Exchange Act claims were time-barred as of April 2002, which was prior to the enactment of Sarbanes-Oxley and the extended statute of limitations for securities fraud actions.

finds more persuasive the reasoning in post-<u>Hill</u> cases that have held that a "violation" for the purposes of Sections 10(b) and 14(a) claims occurs on the date the allegedly false or misleading statement was made.  <u>See</u> discussion <u>supra</u> at 20-21.  Moreover, to state a claim for relief under Section 10(b), a plaintiff must plead that a particular defendant: (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury.  <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 174 (3d Cir.2000).  Thus, a plaintiff must demonstrate in the first instance that a misrepresentation or omission of material fact was made.  Here, where Plaintiffs allege that Defendants made false and misleading statements about Exxon's financial condition in order to induce Mobil shareholders to approve the merger on May 27, 1999 and exchange their shares for Exxon shares on November 30, 1999, it is a matter of simple logic that any such misrepresentation or omission must have occurred prior to the "purchase or sale" of securities.  Because the alleged fraudulent statements concerning Exxon's accounting for its oil and gas reserves appeared as early as April 9, 1999 in the Proxy Statement, this Court cannot hold, even when taking the allegations in the light most favorable to Plaintiffs, that the Section 10(b) violation occurred as late as November 30, 1999.

Moreover, the Complaint itself contradicts Plaintiffs' contention that their Section 10(b) claim arose on the "purchase or sale" date of November 30, 1999.  The Complaint alleges that the Lead Plaintiffs, Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio, purchased Exxon shares during the six-month period <u>prior to</u> the closing of the merger on November 30, 1999.  <u>See</u> Compl. ¶¶ 22-23.  Therefore, the alleged misrepresentations about Exxon's financial status must have occurred prior to that date in order for Plaintiffs to claim that the accuracy of

Exxon's financial statements was "material in that there [was] a substantial likelihood that a reasonable shareholder would have considered them important in choosing to exchange their Mobil Shares on or about November 30, 1999," Id. ¶ 248, and in "deciding how to vote on the proposed acquisition ...." Id. ¶ 237.

### 4.     Effect of Sarbanes-Oxley on limitations period for Section 14(a) claims

Aside from the fact that Plaintiffs' Exchange Act claims were time-barred prior to the enactment of Sarbanes-Oxley and therefore not entitled to the lengthened limitations period afforded by the statute, Plaintiffs' Section 14(a) claim also cannot benefit from the extended limitations period because Section 804 of Sarbanes-Oxley applies only to claims of fraud.

The statute of limitations set forth in Sarbanes-Oxley extended the limitations period for claims brought pursuant to Section 10(b) and Rule 10b-5, lengthening the period set forth in 15 U.S.C. §§ 78i(e) and interpreted by the Supreme Court in Lampf.  See, e.g., Friedman v. Rayovac, 295 F.Supp.2d 957, 974-75 (W.D. Wis. 2003).  Section 10(b) and Rule 10b-5 are provisions of the securities laws clearly targeting securities fraud.  Indeed, the language of Section 804 parallels that of Section 10(b) and Rule 10b-5.  Section 10(b) provides that it is unlawful "[t]o use or employ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations." 15 U.S.C. § 78j(b).  Section 10(b) is enforced by Rule 10b-5, which creates a private cause of action for investors harmed by materially false or misleading statements.  See Advanta, 180 F.3d at 535. Specifically, Rule 10b-5 "makes it unlawful for any person '[t]o make any untrue statement or material fact or to omit to state a material fact necessary to make the statements made in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security.'" In re Ikon Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir.2002) (quoting 17

C.F.R. § 240.10b-5(b)).

Here, Plaintiffs assert Section 14(a) liability against Defendants and allege that they made false and misleading statements in the 1999 Proxy Statement. In contrast to Section 10(b) and Rule 10(b)(5), scienter is not a necessary element in alleging a Section 14(a) claim. See CalPERS, 394 F.3d at 143-44 (citing Gen. Elec. Co. v. Cathcart, 980 F.2d 927, 932 (3d Cir.1992)); Rockefeller, 311 F.3d at 211. To state a claim under Section 14(a), a plaintiff must aver that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. Cathcart, 980 F.2d at 932. An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Shaev v. Saper, 320 F.3d 373, 379 (3d Cir.2003) (citation omitted). Although the limitations period applicable to Section 10(b) claims also applies to Section 14(a) claims, see Westinghouse Elec. Corp., 993 F.2d at 353, several courts have held that the extended limitations period under Sarbanes-Oxley does not apply to Section 14(a) actions because such actions do not require scienter or a showing of fraudulent intent. See In re Global Crossing, Ltd. Sec. Litig., 313 F.Supp.2d 189, 196-97 (S.D.N.Y. 2003) (noting that Section 804 does not apply to Section 14 claims because such claims may be based on negligent misrepresentations that do not involve "fraud, deceit, manipulation, or contrivance."); Virginia M. Damon Trust v. North Country Financial Corp., 325 F.Supp.2d 817, 823-24 (W.D.Mich. 2004); see also In re AOL Time Warner, Inc. Sec. and "Erisa" Litig., 2004 WL 992991, at *7 (S.D.N.Y. May 5, 2004) (noting that "Section 804 expressly states that it applies to 'claims sounding in fraud.'").

On its face, then, the language of Sarbanes-Oxley clearly applies to "claims" of fraud. It does

not specifically apply to claims, like those under Section 14(a), for which fraud is not an element or requisite.  Plaintiffs' Section 14(a) claims, although predicated on fraud, are not fraud claims. Plaintiffs even allege in their Complaint that "Defendants should have known that Exxon was required to report impaired assets under SFAS 121 ....,"  Compl. ¶ 236 (emphasis added), thereby connoting negligence on the part of Defendants.  Furthermore, Plaintiffs do not incorporate any scienter allegations into their Section 14(a) claim in the Complaint, although such allegations appear in their Section 10(b) claim.  See Compl. ¶¶ 229-40.

The fact that Plaintiffs are required to plead their Section 14(a) claim against Defendants with particularity pursuant to the PSLRA does not entitle Plaintiffs to the lengthened statute of limitations. Although Plaintiffs acknowledge that Section 14(a) claims "can be treated as securities-fraud claims for pleading-standard purposes," Pls. Opp. at 18 (emphasis added); they have failed to cite to any case law that treats Section 14(a) actions as fraud claims for statute of limitations purposes.  Furthermore, this Court finds no basis for finding so here.  Thus, the one/three year scheme, not Section 804, applies to Plaintiffs' Section 14(a) claim.

**5.      Plaintiffs' Section 10(b) claim based on Exxon's 10-Qs are time-barred**

In an effort to salvage part of their Section 10(b) claim as timely, Plaintiffs also allege that Defendants are liable for misrepresentations made in the company's quarterly reports on Form 10-Q, filed on August 13, 1999 and November 12, 1999.  Plaintiffs contend that since each of these 10-Qs contains independent, actionable misstatements, their Section 10(b) claims are timely because they had not lapsed under the three-year repose period when Sarbanes-Oxley extended the limitations period in July 2002.  The Court finds this argument without merit.  Most importantly, Plaintiffs have not alleged that they relied on Exxon's representations in these quarterly reports when they exchanged

26

their shares in connection with the merger on November 30, 1999, despite claiming that "[t]he accuracy of Exxon's financial statements was a critical factor in the Mobil Board of Directors' recommendation to move forward with the merger ...," Compl. ¶ 5, and that thus Plaintiffs reasonably relied on such statements. Therefore, Plaintiffs have failed to plead an essential element in a Section 10(b) claim.[14]  See Semerenko, 223 F.3d at 174. Second, the basis of the alleged misrepresentations of Exxon's financial statements in these 10-Qs is the Defendants' failure to properly account for the value of its oil and gas reserves. This failure, which Plaintiffs claim was also a GAAP violation, is conduct that occurred prior to when the 10-Qs were filed with the SEC in August and November 1999. As previously discussed, Plaintiffs were on inquiry notice of Defendants' alleged fraud, at the latest, by April 1999, when the Proxy Statement was disseminated to the shareholders. The Proxy Statement contained the same alleged misrepresentations as reported by Defendants in the subsequent 10-Qs.[15]  See Compl. ¶¶ 185-90. Therefore, the three-year limitations period for Plaintiffs' Section 10(b) claim was triggered when the initial misrepresentation regarding Exxon's failure to record impairments of its oil and gas assets was made in the Proxy Statement. Since such claim lapsed under

---

[14] In light of Plaintiffs' failure to provide any dates of securities purchases, the Court finds unpersuasive Plaintiffs' argument that they have viable Section 10(b) claims based on Defendants' statements in the 10-Qs. Indeed, according to Defendants, Lead Plaintiffs likely owned more Exxon stock than Mobil stock prior to the merger.  See Defs. Reply at 11, n. 8.  Defendants thus contend that Lead Plaintiffs profited, as Exxon shareholders, from the alleged fraud.  See id.  Defendants refer to Exxon-Mobil stock price and dividend charts in support of this argument, see Carvelli Decl. Ex. B, but it is not entirely clear to the Court that these charts reflect Lead Plaintiffs' holdings in Exxon stock prior to the merger.  However, the annual financial report of the State Teachers Retirement System of Ohio ("STRSO") for the period ending June 30, 1999, indicates that STRSO held 3,849,767 shares of Exxon common stock as of June 30, 1999.  See Carvelli Reply Decl. Ex. B.  In addition, the annual financial report of the Ohio Public Employees Retirement System for the year ended December 31, 1998 indicates that this entity held 3,372,500 shares of Exxon stock as opposed to 1,125,600 shares of Mobil stock.  See id. Ex. C.

[15] The Court notes that Plaintiffs do not provide the dates on which they purchased their Mobil shares, stating that such dates are immaterial because their "claims stem solely from the November 1999 Exxon stock transaction ...."  Pls. Opp. at 22, n. 22.  However, Plaintiffs cannot assert a claim based on the alleged misrepresentations in the 10-Qs if they did not trade any securities based on such reports.

the three-year limitations period by April 2002, prior to the enactment of Sarbanes-Oxley, the extended statute of limitations provided by Section 804 of the statute does not apply to Plaintiffs' Section 10(b) claim.

### 6.    Plaintiffs' Section 10(b) "relation-back" argument

In another effort to save their Section 10(b) claim, Plaintiffs contend that such claim is timely under Sarbanes-Oxley's extended five-year limitations period because it relates back to a Section 14(e) tender offer claim made under the Exchange Act and plead in a complaint filed on March 17, 2004.  The Court agrees with Plaintiffs' argument that Defendants were on notice from the initial complaint that the gravamen of Plaintiffs' case was Defendants' failure to recognize impairments of its oil and gas assets in 1998, which resulted in fraudulent statements regarding Exxon's financial condition.  Thus, Plaintiffs' Section 10(b) claim arose out of the same conduct or transaction set forth in Plaintiffs' initial complaint and thus relates back for purposes of <u>Fed.R.Civ.P.</u> 15(c).[16]  However, since the extended five-year limitations period under Sarbanes-Oxley is inapplicable to Plaintiffs' claims in this case, Plaintiffs' "relation-back" argument does not save their claims.

## D.    PSLRA and Rule 9(b) pleading requirements

The Third Circuit has stated that unless plaintiffs in a securities fraud action "allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations ...." <u>Rockefeller</u>, 311 F.3d at 223.  Here, Plaintiffs' Complaint suffers from the failure to demonstrate, with respect to Exxon's refusal to record impairments of its oil and gas assets in 1998 and the alleged

---

[16] <u>Fed.R.Civ.P.</u> 15(c) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading[.]" <u>Fed.R.Civ.P.</u> 15(c).

fraudulent financial statements made in its SEC filings, (1) why a particular statement was misleading, (2) the reasons why such statements were misleading, or (3) if the allegation regarding the statement or omission is made on information and belief, a particularized statement of all facts on which the belief was formed.  15 U.S.C. § 78u-4(b)(1); see also Rockefeller, 311 F.3d at 217. Here, Plaintiffs essentially allege that Exxon's financial statements were materially inaccurate because Exxon failed to recognize certain SFAS 121 impairments and therefore violated GAAP.[17]  While Plaintiffs claim that their expert and confidential witness can demonstrate that Exxon had a duty to record these impairments, these allegations are based solely on Plaintiffs' contention that the state of oil prices in 1998 and the actions of Exxon's competitors mandated such action.  This Court cannot find that such allegations are sufficient to state a claim under the applicable pleading requirements.

Furthermore, "'allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim ... only where such allegations are coupled with evidence of corresponding fraudulent intent, might they suffice.'"  Nappier, 227 F.Supp.2d at 276 (citations omitted); see also Burlington Coat, 114 F.3d at 1417-18 (stating that in cases where plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, plaintiffs are required to state what the unreasonable practices were and how defendants distorted the data); In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 150 (3d Cir.2004) (finding that failure to allege how defendants were involved in GAAP violations constituted failure to state a claim for securities fraud) (citing Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 827-28

---

[17] According to Defendants, Exxon's 1998 10-K, which was incorporated into the Proxy Statement, was audited by Pricewaterhouse Coopers LLP, "which rendered an unqualified opinion that the financial statements contained therein presented fairly, in all material respects, the financial position and results of Exxon in conformity with GAAP."  Defs. Mot. Summ. J. at 21-22.  Plaintiffs do not dispute the accuracy of this opinion.

(8th Cir.2003) (holding that allegations that defendants "designed and implemented" improper accounting practices failed to state claim for securities fraud in absence of allegations of particular facts demonstrating how defendants knew of scheme at time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation)); In re ICN Pharmaceuticals, Inc., Sec. Litig., 299 F.Supp.2d 1055, 1065 (C.D.Ca. 2004) (finding that scienter not established in securities fraud claim where plaintiffs failed to demonstrate that defendants had GAAP obligation to impair its assets at specific earlier time, but chose not to do so with an intent to defraud); In re Adaptive Broadband Sec. Litig., 2002 WL 989478, at *41 (N.D.Ca. 2002) (stating that scienter established "by corroborating GAAP violations with detailed evidence of ... contemporaneous decision-making behind the accounting errors ...."). [18]  Here, Plaintiffs have failed to couple their allegations that Defendants committed a violation of GAAP with evidence of Defendants' fraudulent intent.  Plaintiffs merely allege that Defendants should have known to record the SFAS 121 impairments because of the prevailing industry conditions in 1998 and the actions of Exxon's competitors during this period.  However, Plaintiffs do not in any way specify why Exxon's investment and asset management program, which Defendants claim "reviewed properties on a regular basis and required either improvement or disposition of underperforming assets," Defs. Mot. Summ. J. at 30, did not excuse Exxon from taking the SFAS 121 impairments.  Moreover, Plaintiffs allege that their confidential witness's "access to certain investment cost information and proved-reserve value information, ...

---

[18] At least one court has found that "a delinquent write-down of the impaired asset[], without anything more, does not state a claim of securities fraud, stating at best a bad business decision."  ICN Pharmaceuticals, 299 F.Supp.2d at 1065.

allowed him/her to calculate a SFAS 121 loss on impaired oil and gas properties ....." Compl. ¶ 128. However, nowhere do Plaintiffs specify what this information was or how such information could be the basis for Plaintiffs' allegation that Exxon should have taken the SFAS 121 impairments.

The Third Circuit has held that courts should be "sensitive" to situations in which "sophisticated defrauders" may "successfully conceal the details of their fraud." Rockefeller, 316 F.3d at 216. If plaintiffs can show that the requisite factual information is "peculiarly within the defendant's knowledge or control," the strict requirements of Rule 9(b) may be relaxed. Shapiro, 964 F.2d at 285 (citation omitted). In order to receive the benefit of the relaxed standard, "at the very least plaintiffs must allege that the necessary information lies within defendants' control." Id. A boilerplate allegation that the information "lies within defendants' exclusive control" will not suffice: plaintiffs must accompany such an allegation with a statement of facts upon which the assertion is based. Id. "To avoid dismissal in these circumstances, a complaint must delineate at least the nature and scope of plaintiffs' efforts to obtain, before filing of the complaint, the information needed to plead with particularity." Id.; see also Rockefeller, 311 F.3d at 216.

Here, the information allegedly requiring Defendants to record impairments of Exxon's oil and gas assets in 1998 was not exclusively in the control of Defendants. Plaintiffs go to great lengths in their Complaint to explain the state of oil prices in 1998 and the fact that most of Exxon's competitors recorded SFAS 121 impairments during that year. Thus, Plaintiffs essentially claim that the taking of these impairments by such companies was common knowledge and practice. Indeed, such information was disclosed in public documents filed with the SEC. In addition, Plaintiffs have made no attempt to describe any efforts to obtain any information that they were not able to discover and add as allegations in their Complaint. With respect to the confidential witness, Plaintiffs merely

31

claim that the witness cannot specify the names of any specific impaired oil fields because of "the passage of time and his/her present lack of access to the relevant databases." Compl. ¶ 139. Because Plaintiffs have not adequately alleged that the information that they need lies exclusively in the control of Defendants, and since they have made no attempt to obtain such information, Plaintiffs are not entitled to a relaxed application of Rule 9(b).

**E.      Scienter**

**1.      Exxon**

In a Section 10(b) claim, a plaintiff must show that each defendant acted with scienter - the requisite state of mind to commit fraud. See Advanta, 180 F.3d at 531. Here, Plaintiffs contend that they sufficiently allege scienter for their Section 10(b) claim because "Exxon and Raymond's motive and opportunity for committing fraud [were] based on the benefits to Exxon from acquiring Mobil with inflated Exxon stock." Pls. Opp. at 24. Under their scienter argument, Plaintiffs allege that (1) Defendants were motivated to lie about the value of Exxon's oil and gas properties in order to complete the merger with Mobil and (2) Raymond's post-merger compensation shows his motive to commit fraud. The Court finds that these arguments unavailing because Plaintiffs' allegations do not meet the heightened pleading requirements of the PSLRA.

Under the motive and opportunity test, Plaintiffs must allege facts showing that each defendant had the motive to commit fraud and a "clear opportunity" to do so. See Burlington Coat, 114 F.3d at 1418. Motive "'entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" Nice Sys., 135 F. Supp.2d at 583 (quoting Ganino v. Citizens Utilities Co., 228 F.3d 154, 170 (2d Cir.2000)). Opportunity refers to "the means and likely prospect of achieving such concrete benefits by the means alleged." Ganino v. Citizens

Utilities Co., 228 F.3d 154, 170 (2d Cir.2000) (quoting Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1130 (2d Cir.1994)).  The Third Circuit has stated that "'[m[otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from [the] fraud.'" GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir.2004) (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir.2001) (citation omitted)).   "[C]atch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme" are not sufficient.  Advanta, 180 F.3d at 535.

Here, Plaintiffs' "motive" theory contains precisely the type of allegations that have been routinely rejected as insufficient to demonstrate a strong inference of scienter.  "In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction."  GSC Partners, 368 F.3d at 237.  The motive to complete a corporate transaction is generic and can be imputed to any for-profit company and its officers.  Such allegations alone do not give rise to a strong inference of fraudulent intent.  See id. at 237-38 (citations omitted); Alpharma, 372 F.3d at 153 (citations omitted); Nice Sys., 135 F.Supp. at 583-84.  Rather, Plaintiffs are required to plead particularized facts concerning Defendants' motive to commit fraud.  Here, however, Plaintiffs' allegations fail to demonstrate that Exxon purposefully avoided recording SFAS 121 impairments in order to complete the merger with Mobil.  For instance, Plaintiffs set forth no facts indicating that there was any real danger that the merger would not be consummated and thus, there was no real motive to inflate Exxon's stock.  Without the risk of the merger not being approved, there would have been no reason to defraud the Mobil shareholders.

Scienter cannot be established by merely alleging that Defendants inflated Exxon's earnings in connection with the acquisition of Mobil by a stock-for-stock transaction.  See Pls. Opp. at 25. Plaintiffs' reliance on In re Nui Sec. Litig., 314 F.Supp.2d 388 (D.N.J. 2004) in support of their scienter argument is misplaced.  In Nui, the plaintiffs set forth detailed allegations of the company's fraudulent intent by claiming that a high-ranking officer of the company's subsidiary specifically informed the company of its bad debt practice.  See Nui, 314 F.Supp.2d at 411-12.  The court referred to several letters sent by such officer to the company that detailed specific dollar amounts in losses and bad debts.  See id.  The court concluded that the company knew that bad debt was being improperly characterized (and thus that the company's income was being overstated) and that such mischaracterization occurred in order to inflate the company's common stock, which was the currency used to purchase another entity in an acquisition.  Id.  However, the Nui court did not find a strong inference of scienter based solely on the fact that the company needed to keep its share price high in order to consummate a stock acquisition.  Rather, the court's finding was based on detailed allegations set forth by the plaintiffs that the company purposefully hid from the public its mischaracterization of bad debt.  Thus, the claim that the company made false statements regarding its earnings in its SEC filings was supported by allegations plead with particularity.

Plaintiffs' reliance on In re ATI Technologies, Inc. Sec. Litig., 216 F.Supp.2d 418 (E.D.Pa. 2002) is similarly misplaced.  Plaintiffs focus solely on the ATI court's statement that stock-based acquisitions at the time of the alleged misrepresentations support "a strong motive for artificially inflating the value of company stock in order to minimize dilution ...." ATI, 216 F.Supp.2d at 438. However, the ATI court also found that the plaintiffs set forth sufficient independent factual allegations regarding the defendants' knowing overstatement of its inventory.  See id. at 437-38.

Thus, the court's finding that a stock-based corporate acquisition, where the value of the purchase is "tied entirely to the price of common stock," id. at 440, supports an inference of scienter was based on its determination that the plaintiffs sufficiently alleged that the defendants inflated inventory and thus artificially elevated the price of the company's stock. Here, in contrast, Plaintiffs have not set forth detailed allegations regarding Defendants' misfeasance in the first instance.

Plaintiffs also rely heavily on In re Ravisent Technologies, Inc. Sec. Litig., 2004 WL 1563024 (E.D.Pa. Jul. 13, 2004) in support of their scienter argument; however, that case is distinguishable from this matter. In Ravisent, the plaintiffs alleged that the defendants' motive to fraudulently elevate the price of the company's stock was based on their interest in inflating the company's offering price in its initial public offering, and keeping the price of the company's stock artificially elevated for use in the acquisition of another company. See Ravisent, 2004 WL 1563024, at *10. However, the Ravisent plaintiffs specifically pled how the individual defendants had knowledge of the misstatements regarding the company's recognition of its licensing revenues. See id. at *8-10. Thus, the specific allegation that defendants artificially inflated the stock price by engaging in improper accounting methods constituted a showing of fraudulent intent and was the basis of the court's finding that the defendants had the motive and opportunity to benefit from the alleged fraud. Unlike the plaintiffs in Ravisent, Plaintiffs here have failed to set forth particularized statements of all facts concerning Defendants' motive to commit fraud. As previously discussed, Plaintiffs' allegations do not demonstrate that Exxon purposefully avoided recording the SFAS 121 impairments in order to complete the merger with Mobil. Thus, this Court cannot find that the use of stock in the merger, standing alone, is sufficient to plead scienter on part of Defendants.

## 2.      Raymond

Plaintiffs claim that they have sufficiently plead scienter on the part of Raymond because (1) his post-merger compensation of approximately $43.6 million demonstrates "a concrete benefit from the fraud ..." Pls. Opp. at 30, (2) his position at Exxon meant he "must have known or recklessly disregarded," Compl. ¶ 250(d), the alleged improper failure to record the SFAS 121 impairments, (3) his statements before Congress in 1999 concerning oil prices, and (4) Exxon's corporate history is evidence of Raymond's "leadership of fraud or deliberate misconduct." Compl. ¶ 250(h).[19]  The Court finds all of these arguments without merit.

The Third Circuit has unequivocally stated that a showing that an officer reaped financial benefits from a successful transaction, standing alone, cannot give rise to a strong inference of fraudulent intent.  See GSC Partners, 368 F.3d at 237; see also In re Digital Island Sec. Litig., 357 F.3d 322, 331 (3d Cir.2004) (stating that allegation that defendants "'motivated by a desire to ... increase executive compensation is insufficient because such a desire can be imputed to all corporate officers.'") (quoting Kalnit, 264 F.3d at 139-40); Alpharma, 372 F.3d at 153 (stating that general allegation of desire to increase officer compensation insufficient to establish scienter (citations omitted)).  Moreover, allegations that a defendant, by virtue of his position within a company, must have known about the alleged fraud have been deemed conclusory and inadequate to withstand Rule 9(b) scrutiny and the heightened pleading requirements of the PSLRA.  See Advanta, 180 F.3d at 539 (citations omitted); Alpharma, 372 F.3d at 149.  Here, Plaintiffs make no attempt to specify how Raymond is liable based on his position within Exxon.  For instance, Plaintiffs offer no details of

_____

[19]  The Court notes that Plaintiffs only address Raymond's compensation package in the scienter argument of their opposition brief.

Raymond's involvement in Exxon's decision not to record the SFAS 121 impairments. Instead, Plaintiffs merely state that Raymond, as part of Exxon's management, must have known about the alleged fraud because he "was responsible for the reliability of Exxon's system of internal controls and the accuracy of its financial statements." Compl. ¶ 250(d). Such claim is exactly the kind of conclusory allegation prohibited by the PSLRA mandate.

The Court also finds unavailing Plaintiffs' contention that Raymond's statements to Congress regarding low oil prices and Exxon's corporate history sufficiently establish scienter on the part of Raymond. The Court is at a loss to understand how Raymond's statements that he could not forecast future oil prices demonstrate his intent to misstate Exxon's earnings by not recording the SFAS 121 impairments. Similarly, Plaintiffs' characterization of Exxon as a company with a history of misdeeds is wholly irrelevant in the determination of Raymond's scienter. For the foregoing reasons, this Court finds that Plaintiffs have failed to sufficiently plead scienter on the part of Raymond.

**F.      Recklessness**

Because Plaintiffs cannot sufficiently demonstrate scienter through motive and opportunity, they must demonstrate scienter through allegations of specific facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." Advanta, 180 F.3d at 534-35. A reckless statement is a material misstatement or omission "'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care'" and "'which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" Id. at 535 (quoting McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir.1979)). Allegations of intentional, conscious, or reckless misconduct, like allegations of motive and opportunity, must be supported by specific facts that give rise to a "strong inference"

37

of scienter.  See id.  "Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."  Id. at 539 (citation omitted).

It is not enough for Plaintiffs to allege that Defendants knew or should have known about the alleged fraud.  See GSC Partners, 368 F.3d at 239 (citations omitted).  However, this is precisely the kind of bare allegation that Plaintiffs make in their Complaint.  See Compl. ¶¶ 249-50.  Even if Plaintiffs' allegations regarding Defendants' improper failure to record the SFAS 121 impairments are taken as true, these claims would not demonstrate an "extreme departure" from the standards of ordinary care.  At most, the Complaint demonstrates that Exxon might have engaged in accounting methods not generally used by its competitors.  None of the facts in Plaintiffs' Complaint indicates that Defendants' position on whether to record the SFAS 121 impairments was an egregious departure from the range of reasonable business decisions as opposed to simple corporate oversight or mismanagement.  See Rowinski v. Salomon Smith Barney Inc., 398 F.3d 294, 301 (3d Cir.2005) (stating that claims challenging internal corporate mismanagement are not actionable under Section 10(b)) (citation omitted).  Thus, the Court does not find that Plaintiffs' allegations support a finding of a strong inference of recklessness.

For the reasons stated above, the Court finds that the Complaint fails to satisfy the PSLRA's strict requirement to specify with precision the reasons why the statements in Exxon's SEC filings were misleading.  It also fails to state with particularity allegations specific to Defendants that would give rise to a strong inference of scienter.  Because of Plaintiffs' failure to comply with the PSLRA, Defendants' motion to dismiss the claims under Section 10(b) and Rule 10b-5 will be granted.

## G.    Section 20(a) of the Exchange Act

Plaintiffs also claim that Defendant Raymond is liable for a violation of Section 20(a) of the

38

Exchange Act.  Because, however, a Section 20(a) claim does not create a separate cause of action, but rather depends on the viability of Section 10(b) claims, and the Court is dismissing the claims under Section 10(b) and Rule 10(b)-5, and Plaintiffs' Complaint fails to adequately plead an actionable predicate violation of Section 10(b) or Rule 10b-5, Plaintiffs' claim for "control person" liability under Section 20(a) must be dismissed.  See Shapiro, 964 F.2d at 279.

**H.      Amendment of Plaintiffs' Complaint**

Plaintiffs assert that they should be given leave to amend their Complaint because they "have filed only one amend[ed] complaint."  Pls. Opp. at 31.  Fed.R.Civ.P. 15(a) provides that leave to amend "shall be freely given" by the court "when justice so requires."  Fed.R.Civ.P. 15(a).  Generally, leave to amend is granted when a complaint is dismissed for failure to plead with particularity under Rule 9(b).  See Burlington Coat, 114 F.3d at 1434.  However, leave to amend is "often denied on other grounds, such as undue delay, bad faith, dilatory motive, prejudice and futility."  NAHC, 306 F.3d at 1332 (citing Burlington Coat, 114 F.3d at 1434).  More importantly, however, the Third Circuit has repeatedly noted that the PSLRA has narrowed the application of the amendment standard in securities fraud cases in order to filter out, at the earliest stage, lawsuits that have no factual basis.  See CalPERS, 394 F.3d at 164; Alpharma, 372 F.3d at 153; NAHC, 306 F.3d at 1332; GSC Partners, 368 F.3d at 246.  This case presents a situation in which an amendment of the Complaint would be futile.  As previously discussed, all of Plaintiffs' claims are time-barred; therefore, even a correction of the pleading deficiencies of the Complaint will not save Plaintiffs' claims.  Based on the foregoing considerations, the Court finds that Plaintiffs are not entitled to amend the Complaint.

**III.    CONCLUSION**

The Court grants Defendants' motion to dismiss Plaintiffs' Sections 10(b), 14(a), 20(a), Rule 10b-5 and Rule 14a-9(a) claims, with prejudice, for being untimely.  While not necessary based upon the Court's finding that these claims are time-barred, the Court also grants Defendants' motion to dismiss these claims based on the finding that Plaintiffs have failed to plead their claims with particularity pursuant to Fed.R.Civ.P. 9(b) and the PSLRA.  The Court will issue an appropriate Order reflecting the rulings made herewith.

Dated: September14, 2005_____

_____ /s/ Freda L. Wolfson_____
_____ Honorable Freda L. Wolfson
United States District Judge